**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF TEXAS**

**LUFKIN DIVISION**

A.B., an individual,
Plaintiff,
v.
G6 HOSPITALITY, LLC;
G6 HOSPITALITY IP, LLC;
G6 HOSPITALITY PROPERTY, LLC;
G6 HOSPITALITY PURCHASING, LLC;
G6 HOSPITALITY FRANCHISING, LLC;
MOTEL 6 OPERATING, L.P.; and
BAJRANGI HOTELS, LLC d/b/a MOTEL 6 DALLAS, TX – NORTHWEST,
Defendants.

Civil Action No.: _________________

JURY TRIAL DEMANDED

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff A.B., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This is a civil action for damages brought pursuant to the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was a child, under the age of eighteen years, who was caused to engage in commercial sex acts at the Motel 6 located at 2380 West Northwest Highway, Dallas, Texas 75220 (the "Subject Hotel"), in November 2021 and through and inclusive of August 2023.

3. Plaintiff was fourteen years old when her trafficking at the Subject Hotel began and was fifteen years old when it ended. She was a minor throughout the entire period during which she was trafficked at the Subject Hotel.

4. Where the person caused to engage in a commercial sex act has not attained the age of eighteen years, 18 U.S.C. § 1591(a) does not require a showing of force, threats of force, fraud, or coercion. Plaintiff was a minor during the entirety of her time trafficked at the subject hotel.

5. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. (collectively, the "G6 Defendants" or "Franchisor Defendants") are the franchisors of the Motel 6 brand. Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 brand and the franchising system through which the Subject Hotel operated throughout the period during which Plaintiff was trafficked.

6. Defendant Bajrangi Hotels, LLC (the "Franchisee Defendant") acquired the real property comprising the Subject Hotel by warranty deed recorded on or about July 1, 2019, and upon information and belief has held record title to that property continuously thereafter, including throughout the entire period during which Plaintiff was trafficked. Upon information and belief, at all times relevant to this Complaint Franchisee Defendant owned, operated or co-operated, controlled, and/or managed the Motel 6 located in Dallas, Texas through the G6 franchising system.

7. The G6 Defendants are sued herein in their capacity as franchisor of the Subject Hotel and as participants in the ventures alleged below, and the allegations directed to them are directed to each of them throughout the entire period of Plaintiff's trafficking.

8. Section 1595 of the TVPRA provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1), a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2), a criminal statute; and (3) a beneficiary claim against a civil defendant benefiting from and receiving anything of value from participation in a venture which that person knew or should have known was engaged in sex trafficking. The subject lawsuit is applicable, in part, to prong three, i.e., a beneficiary claim against civil defendants.

**PARTIES**

9. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, and because Plaintiff was a child throughout the events described, Plaintiff proceeds by her initials to protect the privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

10. Plaintiff A.B. is a natural person born in 2007 and is a resident of the State of Texas. She has since attained the age of majority and brings this action in her own name.

11. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

12. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

14. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

15. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

16. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

17. Defendant Bajrangi Hotels, LLC, doing business as Motel 6 Dallas, TX – Northwest, is, upon information and belief, a for-profit limited liability company organized under the laws of and operating within the State of Texas. Said Defendant acquired the real property comprising the Subject Hotel by warranty deed recorded on or about July 1, 2019, and upon information and belief has held record title continuously thereafter. Upon information and belief, said Defendant owned, operated, controlled, and/or managed the Subject Hotel located at 2380 West Northwest Highway, Dallas, Texas through the G6 franchising system at all times relevant to this Complaint, including in November 2021 and through and inclusive of August 2023.

**JURISDICTION AND VENUE**

18. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

19. This Court has personal jurisdiction over Franchisee Defendant. Franchisee Defendant purposefully availed itself of the privilege of conducting activities in this District by soliciting and entering into a franchising relationship with the G6 Defendants in this District, by negotiating, executing, and performing the franchising agreements in this District, by directing payments, notices, reservations, reporting, and other required communications to the G6 Defendants in this District, and by agreeing to suit in this District and to the waiver of objections to personal jurisdiction and venue here, all as further set forth in Paragraph 23 below and in particular Paragraph 23(a), (b), (c), (g), (n), and (q). Plaintiff's claims arise out of and relate to those contacts.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising venture between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled — occurred, in substantial part, in the Eastern District of Texas.

21. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas.

22. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1). Each of the G6 Defendants maintains its principal place of business in the Eastern District of Texas and therefore resides in this District. Franchisee Defendant is subject to this Court's personal jurisdiction with respect to this action and therefore likewise resides in this District pursuant to 28 U.S.C. § 1391(c)(2). All Defendants are residents of the State of Texas.

23. The franchising venture pursuant to which Franchisee Defendant operated the subject motel occurred, in substantial part, in the Eastern District of Texas because:

(a) upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in this District;

(b) on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

(c) on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

(d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

(e) on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in this District, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like A.B.;

(f) on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

(g) on information and belief, Franchisee Defendant was required to attend training and meetings convened by the G6 Defendants;

(h) the G6 Defendants dictated policies related to safety, security, human trafficking, and hotel operations at the subject motel from their principal place of business in the Eastern District of Texas;

(i) on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(j) on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more of the G6 Defendants;

(k) upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in this District;

(l) upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in this District;

(m) on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the franchising agreement;

(n) on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

(o) the day-to-day operations of the subject motel were dictated, controlled, and influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(p) on information and belief, Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee Defendant to use when operating the subject motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

(q) on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

**I. A.B. was a Child Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.**

24. In November 2021 and through and inclusive of August 2023, Plaintiff A.B. was trafficked at the Subject Hotel. She was fourteen years old when that trafficking began and fifteen years old when it ended, and she was a minor throughout.

25. Plaintiff was trafficked by three individuals acting in concert, a male known to Plaintiff as "Damir," a second male known to Plaintiff, and a female known to Plaintiff as "Robin," all of them adults, who together operated a commercial sex trafficking enterprise, run by "Damir," at the Subject Hotel.

26. One of those individuals was subsequently convicted by a federal jury in federal court of two counts of sex trafficking and one count of enticement of a minor. According to the United States Department of Justice, over a period falling entirely within the period during which A.B. was trafficked at the Subject Hotel, that individual recruited young teenage girls, supplied them with drugs, posted sexually explicit advertisements for commercial sex online, and forced them to engage in commercial sex acts with clients for money in hotels around the "blade" or "track," which the Department of Justice describes as the area near the Southwest Freeway and Bissonnet Street in Houston and Harry Hines Boulevard in Dallas "where pimps and traffickers commonly place their victims to engage in commercial sex," transporting his victims between the two cities and keeping all of the proceeds. A.B. was among the teenage girls whom that individual recruited and trafficked during this period, and the Subject Hotel was among the Dallas-area hotels at which he did so. That individual's direct participation in the trafficking of A.B. began in November 2021, when her trafficking at the Subject Hotel began, and ended upon his arrest, and the remaining

traffickers continued to traffic A.B. at the Subject Hotel thereafter, through and inclusive of August 2023.

27. The Subject Hotel sits on West Northwest Highway in northwest Dallas, in the corridor surrounding the intersection of Harry Hines Boulevard and West Northwest Highway — within the very Dallas “track” described by the United States Department of Justice.

28. A.B. was a child. Her youth was apparent to any adult who observed her, including the staff and management of the Subject Hotel, who saw her in and about the property, at its front desk, and in its public areas on approximately one hundred days over a period of approximately twenty-two months, beginning when she was fourteen years old.

29. The traffickers exercised control over A.B. by, among other means, taking and keeping her cellular telephone, her identification, and her other personal belongings, thereby depriving a fourteen-year-old child of the means of communicating with anyone outside their control or of identifying herself to anyone who might assist her.

30. The traffickers advertised A.B. for commercial sex on the internet platform MegaPersonals, and caused sexually explicit images of her, made and published without her consent, to be posted and circulated in order to advertise her for commercial sex.

31. A.B. was compelled to engage in commercial sex acts with numerous sex buyers at the Subject Hotel. The sex buyers paid in cash.

32. The rooms used for the trafficking of A.B. at the Subject Hotel were rented by her traffickers, or at their direction, on a recurring basis, typically in stays of approximately two to five days at a time, in November 2021 and through and inclusive of August 2023, on approximately one hundred days in the aggregate. Upon information and belief, those rooms were booked under the names of Plaintiff’s traffickers, including the individual known to Plaintiff as “Damir.”

33. When Plaintiff's traffickers rented rooms at the Subject Hotel, they arranged for sex buyers to have sex with Plaintiff at the Subject Hotel. Sex buyers arrived at the Subject Hotel and per instructions provided by Plaintiff's traffickers, they walked directly to the room rented for Plaintiff. After spending approximately thirty to sixty minutes in Plaintiff's hotel room engaging in commercial sex with Plaintiff, the sex buyers left the hotel. Sex buyers came and went from the rooms rented for the trafficking of A.B. frequently, at all hours of the day, and that steady foot traffic was observed by the staff of the Subject Hotel.

34. Plaintiff's traffickers also forced Plaintiff to solicit sex buyers on Harry Hines Boulevard, the notorious commercial sex "track" adjacent to the Subject Hotel. Plaintiff's traffickers drove Plaintiff dressed in sexualized clothing inappropriate for her age, from the Subject Hotel to Harry Hines Boulevard where she solicited for sex buyers. The sex buyer then drove Plaintiff from Harry Hines Boulevard back to the Subject Hotel parking lot, and accompanied Plaintiff into the room rented by the trafficker. After Plaintiff had sex with the buyers for approximately thirty to sixty minutes, the buyer accompanied Plaintiff out of the hotel, in view of hotel staff to the Subject Hotel's parking lot and drove Plaintiff to Harry Hines Boulevard where she continued soliciting. This repeated and frequent pattern was observed by the staff of the Subject Hotel.

35. The staff of the Subject Hotel repeatedly and frequently saw sex buyers go to the room rented for Plaintiff at all hours of the day and night; or repeatedly and frequently saw Plaintiff leaving the Subject Hotel dressed in sexualized clothing inappropriate for her age, and then returning to the Subject Hotel and proceeding to the same room with a succession of different adult men.

36. There were open and apparent signs of illegal drug use in and about the rooms used for the trafficking of A.B., observable to the staff of the Subject Hotel who serviced and had access to those rooms. Those signs included drug paraphernalia associated with the use of marijuana, cocaine, crystal methamphetamine, and PCP. Housekeeping staff of the Subject Hotel cleaned the rooms used for the trafficking of Plaintiff during and between the stays, and encountered the drug paraphernalia in those rooms, and returned the rooms to service without report or intervention.

37. There were further open and apparent signs, observable to the staff of the Subject Hotel who serviced and had access to the rooms used for the trafficking of Plaintiff, of the commercial sexual activity being conducted in those rooms, including sexualized clothing, condoms, and sexual lubricant in and about those rooms, and smoke detectors that had been removed or disabled. Plaintiff also appeared in the common areas of the Subject Hotel dressed in sexualized clothing inappropriate for her age, and bore visible injuries including lacerations, burns, abrasions, bruising and swelling. Also, Plaintiff, while wearing sexualized clothing inappropriate for age, smoked cigarettes and marijuana in the parking lot of the Subject Hotel, in plain view of its staff. Occasionally, Plaintiff was present with her traffickers at the front desk of the Subject Hotel, when they rented and paid for the rooms.

38. The physical, behavioral, and psychological effects of sex trafficking on its victims are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on A.B.'s appearance, her evident youth, her dress, her visible injuries including lacerations, burns, abrasions, bruising and swelling, demeanor, and movements throughout the hotel, and her interactions with her traffickers, hotel staff, sex buyers, and others. Observing these effects provided Defendants with notice that A.B. was a child being continually subjected to coercion, control, and exploitation.

**II. Sex Trafficking in the Hotel Industry Is a Well-Known and Pervasive Problem.**

39. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of A.B.

40. The signs of sex trafficking in a hotel environment follow well-established patterns and can be detected by appropriately trained staff. Among the most widely published of those signs are the presence of a minor in the company of unrelated adults, and a stream of unrelated adult male visitors seeking a particular guest.

41. Numerous governmental agencies and non-governmental organizations engaged in combatting sex trafficking, including the United States Department of Homeland Security through its Blue Campaign, the National Center for Missing and Exploited Children, ECPAT, Love146, and the Office of the Attorney General of the State of Texas, have developed and published recommended policies, procedures, and training materials directed specifically to the hotel and lodging industry for the recognition of, and the response to, the signs of sex trafficking, including the trafficking of minors. Those materials were publicly available, and were available to Defendants, at all times relevant to this Complaint.

42. All Defendants were aware or should have been aware of recognized signs of sex trafficking when operating, controlling, and/or managing the Subject Hotel or the aspects of its operation over which they respectively retained control, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

43. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond

to the signs of sex trafficking, and in particular to the signs of the commercial sexual exploitation of children.

**III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.**

44. Defendants have long been on notice of the pervasive problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has also long been on notice of sex trafficking occurring at Motel 6 properties including the Subject Hotel.

45. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles. On information and belief, the G6 Defendants knew that staff at their branded properties were facilitating sex trafficking, and that the G6 Defendants were generating revenue through policies that permitted sex traffickers to operate at G6-branded properties.

46. In November 2016 the City of Los Angeles filed a public nuisance action against G6 Hospitality LLC — a Defendant in this action — and against the managers of the Motel 6 located at 12775 Encinitas Avenue in the Sylmar neighborhood of Los Angeles, seeking to abate what the City described as "unrelenting crime and nuisance activity" at that property. The City alleged that the property served as a base of operations for pimps and prostitutes, for known gang members, and for the distribution of methamphetamine, cocaine, and heroin, and that the Los Angeles Police Department had made more than sixty arrests at the property since 2013, including arrests for prostitution, battery, firearms possession, and drug offenses. Associated Press, *Motel 6 to Pay $250,000 to Settle Human Trafficking Suit* (Aug. 31, 2017) (https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/); *Sylmar Motel 6 Settles with City over Human Trafficking*, Office of Councilmember Monica

Rodriguez, Los Angeles City Council District 7 (https://cd7.lacity.gov/news/sylmar-motel-6-settles-with-city-over-human-trafficking).

47. The conduct that the City alleged was not concealed from the staff of that property. The City alleged that employees of the Motel 6 rented a room, without hesitation, to an undercover Los Angeles police officer who presented himself to them as a pimp and who told them that another undercover officer would be working as a prostitute in that room. The City further alleged that three undercover officers were approached at the swimming pool of the property by a suspected gang member who propositioned them to work as prostitutes, offered to act as their pimp, and offered to advertise them on Backpage.com in exchange for half of the proceeds. Associated Press, *supra*.

48. On or about August 31, 2017 the City of Los Angeles announced that the action had been settled. Under the settlement G6 Hospitality LLC agreed to pay $250,000 toward a program directed at combatting human trafficking, and agreed to implement specified security and management practices at the property for a period of three years. San Fernando Valley Business Journal, *Settlement Reached Regarding Criminal Activity at Motel 6 in Sylmar* (Aug. 31, 2017) (http://www.sfvbj.com/news/2017/aug/31/settlement-reached-regarding-criminal-activity-mot/); *Sylmar Motel 6 Settles with City over Human Trafficking*, *supra*.

49. The operational measures that the 2017 settlement required at that property included:

(a) the presence of a manager at the property twenty-four hours a day;

(b) strict guest registration requirements, including the presentation of valid photographic identification by guests;

(c) enforcement of a “do not rent” list of known criminal offenders;

(d) restrictions upon stays of less than twenty-four hours and upon the rental of rooms for cash;

(e) the installation and operation of a forty-eight camera video monitoring system, and the retention of trained security guards;

(f) secured access to the parking lot of the property for guests;

(g) the posting of notices concerning human trafficking in the lobby of the property, and the blocking of access from the property to Backpage.com, a website then widely used to advertise commercial sex;

(h) training of the employees of the property to detect human trafficking; and

(i) inspection of the property for criminal activity by an executive of G6 together with the filing of reports of those inspections, and the provision to the Los Angeles Police Department of access to the guest list and the visitor logs of the property and of remote access to its security cameras.

50. By August 2017, therefore — more than four years before A.B. was first trafficked at the Subject Hotel — the franchisor, defendant G6 Hospitality LLC knew, and formally undertook to a public prosecutor, that each of the following measures was necessary to prevent a Motel 6 property from being used for commercial sexual exploitation: the collection of photographic identification from guests; the restriction of stays shorter than twenty-four hours and of cash payment for rooms; the maintenance and enforcement of a do-not-rent list; camera surveillance of the property; the posting of trafficking notices; and the training of staff to detect trafficking. Each of those measures bears directly upon the conditions alleged in this Complaint, where rooms at the Subject Hotel were rented on a recurring basis in stays of approximately two to five days, were paid for in cash, and were used by adults who brought a child onto the premises and held her out for

commercial sex to a succession of buyers over approximately twenty-two months, without inquiry, scrutiny, or intervention.

51. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

52. The Sylmar action was not the only notice the G6 Defendants received of sex trafficking at their branded properties. On or about May 4, 2021 — approximately six months before the trafficking of A.B. at the Subject Hotel began — an action was filed in the district courts of Harris County, Texas on behalf of an alleged victim of sex trafficking, *Jane Doe A.A. v. G6 Hospitality LLC, d/b/a Motel 6, et al.*, Cause No. 2021-26731 (11th Jud. Dist. Ct., Harris Cnty., Tex.). That petition named as defendants G6 Hospitality LLC, G6 Hospitality Franchising, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, and Motel 6 Operating, L.P. — the same six G6 entities named as Defendants in this action — together with NNJP LLC, the franchisee doing business as Motel 6 Spring. The petition alleged trafficking at that property and further catalogued numerous additional alleged trafficking incidents at Motel 6 locations throughout the United States. Citation and that petition were served upon Defendant G6 Hospitality LLC on May 7, 2021. The notice the G6 Defendants received of those allegations was therefore not constructive but actual, formal, and documented, and it preceded the trafficking of A.B. at the Subject Hotel by approximately six months and continued throughout the entire twenty-two month period of that trafficking. During the preceding week, additional actions making similar allegations against Motel 6 defendants were filed in the district courts of Dallas County, Texas, concerning alleged trafficking at Motel 6 properties in several other states.

53. That petition did not merely allege trafficking at a single property. It placed before the G6 Defendants a documented catalogue of approximately forty separate incidents of sex trafficking alleged to have occurred at Motel 6 branded properties across the United States between approximately 2003 and January 2019, each supported by a citation to a published news report or to a public record of the United States Department of Justice. A substantial number of those incidents involved the commercial sexual exploitation of children, including girls of ten, fourteen, fifteen, sixteen, and seventeen years of age. Several occurred in Texas, including the alleged sex trafficking of a fifteen-year-old girl at a Motel 6 in Austin in March 2015, the alleged sex trafficking of a fifteen-year-old girl at a Motel 6 in Beaumont in March 2016, and the alleged trafficking of a teenage boy taken to a Motel 6 in Cedar Park in approximately March 2017.

54. That catalogue further placed before the G6 Defendants the fact that public authorities had repeatedly identified Motel 6 branded properties as centers of criminal activity requiring institutional intervention. It alleged that a Motel 6 in Warwick, Rhode Island recorded seventy-five arrests upon its property, for offenses including sex trafficking, over a fourteen-month period ending in approximately April 2015, and thereafter agreed to furnish its guest list to police; that the City Attorney of Columbus, Ohio issued an ultimatum in February 2018 to several area hotels, including a Motel 6, to abate criminal activity or close; and that a Motel 6 in Braintree, Massachusetts surrendered its operating license in September 2018 following documented criminal activity, including sex trafficking, upon its property.

55. The petition further alleged that the Office of the Harris County Attorney had filed a civil nuisance action in 2017 against the Motel 6 Spring property, alleging that the location was notorious for harboring habitual criminal activity including the trafficking of persons, prostitution, the promotion of prostitution, compelling prostitution, and illegal drug offenses; that between

October 17, 2016 and October 17, 2017 there had been more than three hundred twenty calls for law enforcement service at that location; and that officers had made numerous arrests there for prostitution and for the possession of illegal drugs and weapons, and had investigated shootings, robberies, sexual assault, and murder upon the premises. The G6 Defendants were therefore on notice, before the trafficking of A.B. began, that a Texas property bearing their brand had been made the subject of a governmental abatement action predicated upon trafficking and prostitution.

56. Drawing upon that catalogue, the petition served upon the G6 Defendants on May 7, 2021 alleged expressly that the G6 Defendants knew, or at a minimum should have known, that the use of Motel 6 properties for sex trafficking and prostitution was not confined to any one location; that it was not confined to any one geographic region and was a nationwide problem; that Motel 6 properties had been the subject of multiple law enforcement investigations involving sex trafficking; that sex trafficking at Motel 6 properties inherently involved compelled prostitution; that sex trafficking at Motel 6 locations in Houston, Texas was occurring; and that Motel 6 had failed to ensure that adequate policies and procedures were in place and were being followed to prevent sex trafficking. Those allegations were delivered into the hands of the G6 Defendants approximately six months before a fourteen-year-old child was first trafficked at the Subject Hotel.

57. The use of Motel 6- and Studio 6-branded properties for sex trafficking has continued to be the subject of litigation against the G6 Defendants. In *Doe (K.E.C.) v. G6 Hospitality, LLC*, 750 F. Supp. 3d 719 (E.D. Tex. 2024) — brought in the same District in which this action is filed — the court denied the G6 Defendants' motion to dismiss a trafficking survivor's claims under the TVPRA arising at a Studio 6-branded property, holding that she had plausibly alleged that the G6 Defendants knowingly benefited from and participated in a sex trafficking venture at their branded property and knew or should have known of her trafficking. In *Doe (S.R.C.) v. G6*

*Hospitality, LLC*, No. 9:23-CV-00165 (E.D. Tex.), another survivor alleges that she was trafficked for commercial sex at Motel 6-branded properties in the Dallas–Fort Worth area, and summary judgment was denied. *See* 2024 WL 6998379 (E.D. Tex. Sept. 25, 2024); 2026 WL 1918034 (E.D. Tex. Mar. 26, 2026). And in *M.W. v. Radheshvar LLC*, No. 25-cv-4747 (N.D. Ga.), a survivor alleges that, as a fifteen-year-old, she was trafficked for commercial sex for approximately a year at Atlanta-area motels operated under the Motel 6 and Super 8 brands.

58. The G6 Defendants were aware of those actions and answered them publicly. A spokesperson for Motel 6 stated to the press that the company condemns every form of human trafficking, that trafficking is a global societal problem requiring the combined effort of multiple stakeholders, and that Motel 6 maintains a proactive posture of zero tolerance toward it. (Bisnow, *DFW-Based Motel 6 And Affiliated Companies Named In Five Sex Trafficking Cases* (https://www.bisnow.com/news/dallas-ft-worth/commercial-real-estate/dfw-based-motel-6-and-affiliated-companies-named-in-five-sex-trafficking-cases-victim-claims-employees-knew-108778)). The G6 Defendants therefore entered the period during which A.B. was trafficked at the Subject Hotel with specific, recent, and public notice that sex trafficking was being alleged at Motel 6 properties, including at Motel 6 properties in Texas.

59. The G6 Defendants also answered that petition in court. On May 28, 2021 — approximately six months before the trafficking of A.B. at the Subject Hotel began — all six of the G6 entities named in that action, the same six entities named as Defendants here, appeared through counsel and jointly filed an answer, specific denials, and affirmative defenses. In the introduction to that pleading the G6 Defendants represented to the Court that, from a corporate level, they take a number of steps to thwart trafficking, including requiring valid photo identification from all registered guests, to be cross-referenced against a national registry of guests who have exhibited

problematic behavior of any nature in the past; requiring Motel 6 properties to prominently display human trafficking awareness signage featuring the National Human Trafficking Hotline; maintaining a proprietary hotline for hotel staff to report suspected trafficking for immediate assistance and attention, together with a confidential hotline for staff to report violations of G6 anti-human trafficking policy; performing background checks upon their own employees; and fostering working relationships with local law enforcement and anti-human trafficking task forces everywhere Motel 6 operates. The G6 Defendants further represented that they had worked with law enforcement to develop training to help their employees and their franchisees identify and report the signs of human trafficking.

60. In that same pleading, however, the G6 Defendants specifically denied that G6 Hospitality exerts day-to-day control over its franchisees or exercises an ongoing right of control over the franchised property at issue, and specifically denied that they owned, operated, managed, controlled day-to-day operations, or employed any staff at that property. Those two positions cannot both be correct. A franchisor that dictates the identification a franchisee must collect from every registered guest, that operates the national registry against which those guests are screened, that specifies the signage displayed within the guest rooms, that owns and staffs the hotline into which property employees are directed to escalate suspected trafficking, and that creates and controls the training curriculum delivered to franchisee employees is exercising precisely the control over the means and methods of day-to-day hotel operation that this Complaint alleges. Either the G6 Defendants exercised that control, in which case the corporate-level systems they described to a Texas court registered nothing while a fourteen-year-old child was held out for commercial sex upon their branded premises on approximately one hundred days over

approximately twenty-two months; or they did not, and the program they described in a pleading filed with that court did not operate at the Subject Hotel in any form capable of protecting A.B.

61. Upon information and belief, the systems the G6 Defendants so described generate records retrievable at the level of the individual guest, the individual room, and the individual stay. In a subsequent amended pleading in that same action, the plaintiff alleged that Motel 6 records reflected the particular room her trafficker occupied at a Motel 6 property across a specified range of dates, and further reflected that her trafficker had been placed upon do-not-rent status at that property following a disturbance. The brand-wide guest registration and do-not-rent systems described above therefore capture, retain, and make retrievable the identity of the person renting each room, the room assigned, the dates of each rental, and the disposition of guests flagged for problematic conduct. Had the G6 Defendants reviewed that data as to the Subject Hotel with reasonable diligence, it would have disclosed the recurring pattern of short-stay, cash-paid rentals by A.B.'s traffickers over approximately twenty-two months.

62. The account the G6 Defendants have given of their own anti-trafficking program reaches back further still. As alleged in the petition served upon them in May 2021, in September 2018 — more than three years before the trafficking of A.B. at the Subject Hotel began — G6 Hospitality announced publicly that the company would introduce anti-human trafficking training to its corporate, field, and property team members, and that it had developed its own training for all property team members to understand how to effectively intervene and identify potential trafficking situations in order to protect one another, their guests, and the community. By that announcement the G6 Defendants acknowledged the risk of trafficking at their branded properties, assumed responsibility for training the staff of those properties to detect it, and asserted the operational reach necessary to deliver that training to every property team.

63. Trafficking at Motel 6 branded properties nevertheless continued after that announcement. The petition served upon the G6 Defendants alleged that in November 2018 federal authorities arrested a man for sex trafficking a woman out of a Motel 6 in San Jose, California; that in December 2018 a husband and wife were arrested for sex trafficking women out of a Motel 6 in Portsmouth, New Hampshire over a period running from approximately 2016 through 2017; and that in or about January 2019 a fourteen-year-old girl was held against her will and sex trafficked at a Motel 6 in Raleigh, North Carolina. The G6 Defendants accordingly entered the period of A.B.'s trafficking having announced a training and intervention program, having been told in a pleading served upon them that trafficking at their branded properties had continued notwithstanding that program, and having taken no step sufficient to prevent the commercial sexual exploitation of a child upon their branded premises at the Subject Hotel over the twenty-two months that followed.

64. The G6 Defendants have themselves publicly and repeatedly represented that they know sex trafficking occurs at properties of the kind they franchise, and that they exercise the authority to require every franchised Motel 6 property to train its staff to detect it. On July 30, 2019 G6 Hospitality announced that it had signed ECPAT’s Tourism Child-Protection Code of Conduct, a framework directed specifically at the commercial sexual exploitation of children in travel and tourism. In the same announcement G6 Hospitality LLC stated that it requires trafficking awareness and prevention training of "all team members at all locations, both owned and franchised," and that it mandates human trafficking prevention training developed by the non-profit Businesses Ending Slavery and Trafficking and sponsored by the Asian American Hotel Owners Association, which teaches team members to recognize and report human trafficking. G6 Hospitality LLC further stated that its teams regularly assess properties to ensure that safety and security measures are in place and that training is completed, and that it takes action "up to and

including terminating contracts or closing locations, as appropriate." (G6 Hospitality LLX, *G6 Hospitality Partners with ECPAT-USA to Combat Trafficking and Exploitation* (July 30, 2019) (https://g6hospitality.com/g6-hospitality-partners-with-ecpat-usa-to-combat-trafficking-and-exploitation/)).

65. On January 25, 2023 — during the very period in which A.B. was being trafficked at the Subject Hotel — G6 Hospitality issued a further public statement reaffirming those commitments. In that statement the President and Interim Chief Executive Officer of G6 Hospitality stated that the company seeks to raise awareness of trafficking through advocacy, education, and enhanced safety procedures, and by ensuring that its franchise owners and its property teams understand the importance of “remaining vigilant and taking action.” G6 Hospitality further stated that it had instituted comprehensive awareness programs, proprietary training, and response programs within the local communities its franchisees serve, and that all of its team members and owners share an active role in combatting trafficking. (G6 Hospitality, *G6 Hospitality Furthers Commitment to Combating Human Trafficking* (Jan. 25, 2023) (https://www.hospitalitynet.org/news/4114648/g6-hospitality-furthers-commitment-to-combating-human-trafficking)). Motel 6 is also the first hotel company to have become a member of the Texas Businesses Against Trafficking Alliance, and G6 Hospitality participates in the No Room for Trafficking campaign of the American Hotel & Lodging Association. (G6 Hospitality, *Combating Human Trafficking* (https://g6hospitality.com/about-us/combating-human-trafficking/)).

66. Those public representations are admissions. By the G6 Defendants’ own account they knew that sex trafficking occurs at economy lodging properties, including their own; they possessed and exercised the authority to require the training of every member of the staff of every franchised Motel 6 property, including the Subject Hotel; they possessed and exercised the

authority to assess those properties and to act upon the results of those assessments; and they held their franchise owners and their property teams responsible for remaining vigilant and taking action. Either those representations were accurate, in which case the G6 Defendants exercised over the Subject Hotel the control alleged throughout this Complaint and their own training, assessment, and response systems registered nothing while a fourteen-year-old child was held out for commercial sex upon their branded premises on approximately one hundred days over approximately twenty-two months; or those representations were not accurate, and the anti-trafficking program that the G6 Defendants described to the public did not exist in any form capable of protecting A.B.

**IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.**

67. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

68. The G6 Defendants generate, receive, monitor, and analyze reports of guest complaints and of online reviews concerning their branded properties, including the Subject Hotel. Franchisee Defendant likewise monitored, or in the exercise of reasonable care would have monitored, the publicly posted reviews of the property it owned and operated.

69. Publicly posted guest reviews of the Subject Hotel, appearing on TripAdvisor, described open commercial sex activity and law enforcement presence at the Subject Hotel. The review set forth below was publicly posted on the internet and was publicly available thereafter, including throughout the period during which A.B. was trafficked at the Subject Hotel.

70. That review, posted on August 27, 2014 under the title "Dump" and rating the Subject Hotel one bubble out of five, stated: "Bugs, cops and hookers. This motel needs to be shut down." That review remains publicly posted and visible on TripAdvisor as of the filing of this Complaint (https://www.tripadvisor.com/ShowUserReviews-g55711-d109453-r224769114-Motel_6_Dallas_TX_Northwest-Dallas_Texas.html).

71. Two days after that review was posted, on August 29, 2014, a public response to it was published on the same platform. That response was not published under the identity of the owner or operator of the Subject Hotel. It was published under the identity of the Brand Experience Team of the Motel 6 brand — that is, under the identity of the franchisor. In that response the responding party addressed the reviewer by name, thanked her for sharing her concerns, apologized, characterized the conditions she described as an exception to the Motel 6 guest commitment, and directed her to contact a Motel 6 Guest Relations Department at the brand-wide toll-free telephone number 1-855-787-9864 in order to further address her stay and to be offered a better guest experience in the future. That response likewise remains publicly posted and visible on TripAdvisor as of the filing of this Complaint.

72. That was not an isolated instance. Upon information and belief, the same brand-level team published responses to other publicly posted reviews of the Subject Hotel in the years that followed, including a response published on October 11, 2014 to a review reporting a roach infestation and a response published on May 11, 2017 to a review reporting a bedbug infestation at the Subject Hotel (https://www.tripadvisor.com/ShowUserReviews-g55711-d109453-r479987180-Motel_6_Dallas_TX_Northwest-Dallas_Texas.html), each of which likewise directed the reviewer to the same brand-wide Guest Relations telephone number, 1-855-787-9864.

The G6 Defendants thus maintained a standing practice of monitoring, receiving, and answering publicly posted guest reports concerning this particular property under their own brand identity.

73. The published response establishes, on the face of the public record, that:

(a) the review was not merely available to the G6 Defendants but was actually received, read, and acted upon by them within two days of its posting;

(b) the G6 Defendants, and not merely the owner or operator of the Subject Hotel, monitored the publicly posted reviews of this particular property and answered them under their own brand identity;

(c) the G6 Defendants controlled the channel through which guest complaints concerning the Subject Hotel were received and answered, and participated directly in the responses to them, as further alleged in Section VIII below;

(d) the G6 Defendants maintained a centralized, brand-level Guest Relations Department, reachable at a single brand-wide toll-free number, to which guest reports concerning conditions at the Subject Hotel were routed and recorded; and

(e) the G6 Defendants treated a public report of open commercial sex activity and law enforcement presence at their branded property as a customer service matter to be routed to a guest relations telephone line, rather than as a report of criminal activity at the Subject Hotel warranting investigation, retraining, supervision, discipline, or a report to law enforcement.

74. The TripAdvisor review was not the only publicly posted report of commercial sex activity at the Subject Hotel. A review posted to Google ten years prior to the filing of this Complaint reported, in part: “Constant & strong weed smell in lobby & elevator, parking lot/lobby drama from stripper/prostitute guests.”

75. That review does not merely describe the general character or condition of the Subject Hotel. Writing publicly and unprompted, a member of the public reported that persons engaged in commercial sex were among the guests of the Subject Hotel, and that the disturbances attending their presence occurred in the lobby and the parking lot of the property. The lobby is the one area of the property that is continuously staffed, occupied, and observed by the front desk personnel of the Subject Hotel, and, upon information and belief, both the lobby and the parking lot are monitored by the surveillance cameras described below. Commercial sex activity occurring openly in those spaces could not have escaped the notice of a reasonably attentive staff.

76. The same review reported a constant and strong odor of marijuana in the lobby and the elevator of the Subject Hotel — that is, open and apparent signs of illegal drug use in the common areas of the property, of the same character as the signs of illegal drug use apparent in and about the rooms used for the trafficking of A.B. years later.

77. Other publicly posted reviews of the Subject Hotel reported the same character of conditions. A TripAdvisor review posted in March 2015, rating the Subject Hotel one bubble out of five, warned that the property is “not far from prostitution alley and that’s really all we saw checking in” (https://www.tripadvisor.com/ShowUserReviews-g55711-d109453-r259199974-Motel_6_Dallas_Northwest-Dallas_Texas.html).

78. The reviews described above were posted on different platforms, over a period of years, and independently of one another. Together they establish that reports of open commercial sex activity at the Subject Hotel, occurring in the staffed and observed common areas of the property, were publicly posted and publicly available over a period of years preceding the trafficking of A.B., and that the conditions they described were persistent rather than isolated.

79. The G6 Defendants were therefore on notice, years before A.B. was trafficked at the Subject Hotel, that commercial sex activity was being conducted openly and repeatedly at this particular property, including in its lobby and parking lot, and that the property's condition had prompted a member of the public to call publicly for its closure. The G6 Defendants nevertheless continued to franchise the Motel 6 brand at the Subject Hotel, and upon information and belief did so without investigating, remediating, or imposing any additional safety, security, or anti-trafficking measures at that property, with the result that the conditions described continued and A.B. was trafficked there.

80. The conditions described in those reviews reflect the location of the Subject Hotel. The Subject Hotel sits on West Northwest Highway in northwest Dallas, in the corridor surrounding the intersection of Harry Hines Boulevard and West Northwest Highway that has for decades constituted one of the most notorious open-air commercial sex markets in the United States — the Dallas "track" or "blade." In September 2019, upon announcing prostitution arrests on Harry Hines Boulevard, the Dallas Police Department stated publicly that prostitution had "plagued the area for decades" (https://www.cbsnews.com/texas/news/dallas-police-arrest-6-men-for-prostitution-on-harry-hines-boulevard). As set forth above, Plaintiff was caused to solicit sex buyers on Harry Hines Boulevard, her trafficker drove her from the Subject Hotel to solicit on Harry Hines Boulevard, and sex buyers repeatedly drove her from that street directly back to the Subject Hotel.

81. The public record of open commercial sex activity in that corridor continued through the very months during which A.B. was being trafficked at the Subject Hotel. In October 2022, journalists embedded with Dallas Police Department officers during night enforcement operations directed at sex trafficking and prostitution in the corridor reported officers arresting suspected

prostitutes outside the motels of the area, and a Dallas police deputy chief stated: "It's just been an issue in this area for many years" (https://www.cbsnews.com/dfw/news/dallas-police-conduct-enforcement-operations-in-a-neighborhood-overrun-by-prostitution/). Of the 314 prostitution offenses reported citywide in Dallas in calendar year 2022, 213 — approximately two-thirds — occurred in the single city council district containing the corridor in which the Subject Hotel sits (https://dallasexpress.com/crime-boss-content/district-6-dallas-prostitution-hotspot/). In June 2023, the Dallas Police Department formed a dedicated prostitution task force for its Northwest Division, and by August 2023 — the final month of Plaintiff's trafficking at the Subject Hotel — the Northwest Division accounted for approximately ninety-five percent of the prostitution offenses reported in the entire City of Dallas (https://dallasexpress.com/crime-boss-content/prostitution-dpd-shortage-plague-nw-dallas/).

82. As set forth above, the United States Department of Justice has publicly described Harry Hines Boulevard in Dallas as a place "where pimps and traffickers commonly place their victims to engage in commercial sex," and has obtained the federal conviction of one of A.B.'s own traffickers for sex trafficking minors in hotels around that corridor during the very period of A.B.'s trafficking. No operator of a hotel located in that corridor, and no franchisor placing its brand upon such a hotel and deriving revenue from its room rentals, could reasonably have been unaware of the open commercial sex market surrounding the property or of the acute and specific risk that its rooms were being used for commercial sexual exploitation, including the commercial sexual exploitation of children.

83. Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on the following facts, specific to this property and to A.B. herself:

(a) upon information and belief, the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) that unrelated adult men repeatedly and frequently proceeded through the hotel, sometimes with Plaintiff dressed in sexualized clothing inappropriate for her age, at all hours of the day and night, directly to and from the rooms rented for Plaintiff;

(c) that hotel staff observed A.B. herself, a girl of fourteen and then fifteen years of age, in and about the property, frequently dressed in sexualized clothing inappropriate for her age, with visible injuries including lacerations, burns, abrasions, bruising and swelling indicative of physical abuse, in the company of adult men who were not her family;

(d) the open and apparent signs of illegal drug use and commercial sexual activity in and about those rooms; and

(e) that the rooms used for the trafficking of A.B. were rented on a recurring basis, typically in stays of approximately two to five days at a time, on approximately one hundred days over a period of approximately twenty-two months.

**V. Defendants knew A.B. was being trafficked at the Subject Hotel because of the obvious signs of her trafficking.**

84. During the period that A.B. was trafficked at the Subject Hotel, there were signs obvious to hotel staff and management that she was a child being trafficked, including:

(a) A.B. was visibly a child, fourteen years of age when the trafficking began, present at the Subject Hotel on approximately one-hundred days, over a period of approximately twenty-two months, frequently wearing sexualized clothing inappropriate for her age, with visible injuries including lacerations, burns, abrasions, bruising and

swelling indicative of physical abuse, and in the company of adult men who were not her family;

(b) A steady and frequent parade of unrelated adult men proceeded directly to the rooms rented for the trafficking of A.B., at all hours of the day, many having driven A.B. or her co-victims back to the Subject Hotel from the Harry Hines Boulevard track where A.B. and the girls were caused to solicit;

(c) The rooms used for the trafficking were rented by the traffickers, or at their direction, in recurring stays of approximately two to five days at a time over a period of approximately twenty-two months;

(d) Open and apparent signs of illegal drug use in and about the rooms used for the trafficking, together with condoms, sexual lubricant, and provocative clothing observable to the staff who serviced those rooms, and smoke detectors that had been removed or disabled;

(e) Sex buyers paid in cash;

(f) A.B.'s traffickers frequently paid for rooms at the Subject Hotel in cash;

(g) A.B. was under the evident direction and control of three adults who were not her parents or guardians and who held her identification and her telephone; and

(h) A.B. bore visible injuries including lacerations, burns, abrasions, bruising and swelling indicative of physical abuse, observable to the staff of the Subject Hotel;

(i) A.B. appeared in the common areas of the Subject Hotel dressed in sexualized clothing inappropriate to her age; and

(j) Hotel staff observed the foregoing red flags, yet took no action to stop the trafficking, report it, or intervene.

85. Hotel staff and management observed, or should have observed, the foregoing obvious signs of sex trafficking including items set forth in the preceding paragraph.

86. When being trafficked at the Subject Hotel in November 2021 and through and inclusive of August 2023, A.B. was aware that staff of the Subject Hotel observed A.B., her traffickers, as well as sex buyers going in and out of the subject rented rooms, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

87. A.B. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to A.B. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

88. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

89. Upon information and belief, the Subject Hotel was equipped with surveillance cameras positioned throughout the property, including in and about its lobby, corridors, entrances, walkways, and parking areas. Upon information and belief, the images captured by those cameras were displayed upon monitors located at the front desk of the Subject Hotel, which were monitored, or were required to be monitored, by the staff, management, and ownership of the Subject Hotel. The red flags of the trafficking of A.B. set forth above, including the steady foot traffic of adult male sex buyers to and from the rooms rented for her trafficking and her own passage through the property as a child, occurred within the view of those cameras.

90. As such, Defendants knew or should have known that A.B. was being trafficked at the Subject Hotel.

91. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of the sex trafficking of a child specifically, because they included the presence of a girl of fourteen and then fifteen years of age, over a period of approximately twenty-two months, under the evident direction and control of three unrelated adults, in rooms to which a stream of unrelated adult men proceeded openly, one after another, at all hours of the day, within the view of the hotel's staff. These signs, individually and collectively, provided Defendants with notice that a child was being commercially sexually exploited upon their premises.

**VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of A.B.**

92. Defendants had both actual and constructive knowledge of the trafficking of A.B. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

93. The rooms used for the trafficking of A.B. were rented and/or renewed by the traffickers, or at their direction, on a repeated, recurring basis in November 2021 and through and inclusive of August 2023.

94. Defendants rented rooms to individuals it knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

95. Franchisee Defendant, through its staff, rented the rooms used for the trafficking of A.B., collected payment for those rooms, sometimes saw A.B. with her older adult male traffickers when they checked into the room, and observed the parade of adult men who accompanied her from the Subject Hotel's parking lot to the rooms rented for A.B. by the trafficker and then back to

the parking lot where A.B was driven away, only to return a short time later with a different adult male, and they interacted face-to-face with A.B. and her traffickers on a regular and repeated basis over approximately twenty-two months. These were not passive observations of trafficking from a distance; Franchisee Defendant was involved in the commercial transactions that provided the venue for the trafficking of a child.

96. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms rented that were used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA in November 2021 and through and inclusive of August 2023.

97. The rooms at the subject hotel that were used for the sex trafficking of the Plaintiff were rented by the traffickers or at their direction. Discovery will reveal additional facts concerning the manner in which the traffickers and those acting at their direction booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

(a) the guest registration records maintained by Defendants for each such booking and renewal, including the names under which the rooms were registered;

(b) the identification, if any, that staff of Defendants required at the time of each booking or renewal;

(c) the records maintained by Defendants of the method and form of payment for the rooms so rented; and

(d) the records maintained by Defendants of inquiries made at the front desk of the Subject Hotel concerning the occupants of those rooms.

98. Defendants allowed the traffickers and those acting at their direction on the subject premises to continue to rent and pay for rooms at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

99. Franchisee Defendant was the record owner of the real property comprising the Subject Hotel continuously from on or about July 1, 2019, and was the owner and operator of the Subject Hotel throughout the entire period of A.B.'s trafficking. Accordingly, the allegations of this Complaint directed to the owner and operator of the Subject Hotel are directed to Franchisee Defendant throughout that entire period. The allegations directed to the G6 Defendants in their capacity as franchisor of the Subject Hotel are directed to those Defendants throughout that same period.

100. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, Franchisee Defendant continued renting rooms used to sexually exploit Plaintiff.

101. Franchisee Defendant knew or should have known that A.B. was a child being trafficked and, despite this, benefited from continued association with her traffickers by providing a venue for her exploitation.

102. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of A.B., in ways including:

(a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking, including the commercial sexual exploitation of children;

(b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

(c) on information and belief, choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures, notwithstanding the obvious red flags of the trafficking of A.B. observable to its staff;

(d) permitting a visibly minor girl to check into rooms with an older, unrelated adult male; permitting a visibly minor girl to use rooms rented by an older, unrelated adult male; permitting a visibly minor girl, wearing sexualized clothing inappropriate for her age, to use rooms with different adult males who repeatedly drove her to and from the hotel at all hours of the day and night; and permitting a parade of unrelated adult men to proceed directly to the rooms rented for her, without inquiry, scrutiny, or intervention;

(e) renting rooms on a recurring basis, over a period of approximately twenty-two months, to adults who brought a child onto its premises and held her out for commercial sex there, without inquiry, scrutiny, or intervention; and

(f) creating an environment where the traffickers did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate openly — including by allowing sex buyers to accompany their child victims openly through the property to the rooms and by allowing the child victims themselves to check in and to wait in the rooms for a parade of buyers — without concern for detection or interference by the hotel staff.

103. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of A.B.

104. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued to control, participate in, and derive revenue from the rental of rooms at the Subject Hotel, including the rooms used to sexually exploit victims, including A.B.

105. G6 knew or should have known that A.B. was being trafficked and, despite this, benefited from continued association with her traffickers by providing hotel rooms and related services used for her exploitation.

106. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

(a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

(b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

(c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

(d) the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

(e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel;

(f) the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal; and

(g) the G6 Defendants allowed traffickers to reserve and pay for rooms on a short-term, day-by-day or night-by-night basis, which provided relative anonymity and non-traceability.

107. If G6 had exercised reasonable diligence in the areas of the operation of the Subject Hotel over which it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of A.B. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of A.B.

**VII. Defendants knowingly benefited from participation in a venture that they knew or should have known was engaged in sex trafficking.**

108. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with the traffickers and with one another.

109. The repeated rental transactions between the traffickers (and those acting at their direction) and the Subject Hotel which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking — including the presence of a child of fourteen and then fifteen years of age upon the premises over approximately twenty-two months under the control of unrelated adults, the stream of unrelated adult men who openly accompanied and visited that child in the rooms rented for her, the steady foot traffic of sex buyers to and from the rooms, the recurring short-stay rentals, the cash payments, and the open and apparent signs of illegal drug use and commercial sexual activity in and about those rooms — such that said Defendants knew, or should have known, that they were renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

110. A venture existed between the traffickers and Franchisee Defendant at the subject hotel premises by means of rooms repeatedly rented for the trafficking, which rooms Defendants knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

111. A venture also existed between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled.

112. The Franchisee Defendant participated in the sex trafficking venture through a continuous business relationship with A.B.'s traffickers: it repeatedly rented rooms at the Subject Hotel to those traffickers, on approximately one hundred days over approximately twenty-two months, when it knew or should have known that they were trafficking A.B. there. Relative to the subject hotel, a continuous business relationship existed between Franchisee Defendant and the traffickers' sex trafficking business, in part, in that Defendant provided assistance, support, or facilitation to the traffickers and individuals it knew or should have known were involved in sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

113. Relative to the subject hotel, a continuous business relationship existed between Franchisor Defendants and the traffickers' sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the traffickers and individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

114. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant

received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. Upon information and belief, pursuant to the franchising agreement, Franchisee Defendant was required to remit to the G6 Defendants a percentage of the gross room revenue generated at the Subject Hotel, together with additional fees calculated upon that revenue. Upon information and belief, the principal source of the income the G6 Defendants derived from the Subject Hotel was the franchising royalty fee, and the G6 Defendants further derived income from reservation fees, marketing fees, loyalty program fees, and other ancillary fees, each as provided in the franchise documents. Upon information and belief, those fees were calculated primarily upon gross room rentals, with the consequence that the revenue and the profit of the G6 Defendants increased with each additional room rented at the Subject Hotel, including each room rented for the trafficking of A.B. on each of the approximately one hundred days on which she was trafficked there. The G6 Defendants therefore received a direct financial benefit from each room rented at the Subject Hotel, including each room rented for the trafficking of A.B.

## VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.

115. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and the staff of the Subject Hotel.

116. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

117. Upon information and belief, and consistent with the standard practice of the hospitality industry, the G6 Defendants set exacting brand standards governing the operation of the Subject Hotel, reaching such matters as the temperature at which coffee is to be served, the number of pillows to be placed upon the beds, the forms of payment to be accepted, and when, where, and how guests are to be greeted. The G6 Defendants further supplied the signage displayed on and in front of the building and required the Motel 6 brand and marks to be displayed throughout the property, including upon the stationery placed in the guest rooms and upon the uniforms worn by the staff stationed at the front desk, so that a guest arriving at the Subject Hotel would expect an experience consistent with the standards of the Motel 6 brand. The average guest does not perceive the relationship between franchisor and franchisee. The brand supplies the property its identity, and the G6 Defendants hold themselves out to the public as the owners and operators of the Subject Hotel. The right of the G6 Defendants to enforce their brand standards, including their safety and security standards, was not merely their right but their responsibility.

118. The G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant:

(a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hotel;

(b) covered virtually all aspects of hotel operations, including internal operating functions;

(c) dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hotel; and

(d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

119. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise control over the day-to-day operation of the Subject Hotel, including:

(a) requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations;

(b) controlling training content and methods for hotel staff;

(c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections, including annual on-site inspections conducted for the purpose of confirming that the policies and procedures of the G6 Defendants were being complied with;

(m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements;

(n) controlling all marketing and prohibiting unauthorized online presence;

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations;

(p) requiring all hotel staff to complete training created, controlled, and maintained by the G6 Defendants through an online learning platform that the G6 Defendants owned and operated, and retaining sole discretion to determine whether such training had been satisfactorily completed;

(q) providing benefits for the employees of the Subject Hotel;

(r) upon information and belief, setting or controlling the wages paid to the employees of the Subject Hotel;

(s) upon information and belief, making or controlling employment decisions concerning the staff of the Subject Hotel, and controlling the advertising by which positions at the Subject Hotel were filled;

(t) requiring the use of a customer relationship management program maintained and operated by the G6 Defendants; and

(u) requiring that the property management system in use at the Subject Hotel be linked to the corporate network and data center of the G6 Defendants, through which room reservations were received and payment transactions for those rooms were processed.

120. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when its branded hotels would share information with law enforcement and over when law enforcement would be contacted about suspected criminal activity at its branded hotels;

(c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff or franchising agreements based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking;

(i) setting, supervising, and enforcing detailed policies and protocols for housekeeping services at the Subject Hotel, including how frequently guest rooms were required to be entered, how staff were required to respond when a guest declined entry to a room, and the steps by which guest safety issues were to be monitored through housekeeping services; and

(j) collecting, maintaining, and analyzing detailed data regarding housekeeping services at the Subject Hotel, including data that would reveal patterns consistent with human trafficking.

121. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval;

(c) establishing and maintaining a brand-wide guest rewards and loyalty program, membership in which afforded guests a faster and simpler booking process and direct access to discounted rates, including a discount upon the best available nightly rate, and participation in which the G6 Defendants required of their branded properties, including the Subject Hotel;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) upon information and belief, controlling the forms of payment that could be accepted for rooms at the Subject Hotel, including whether rooms could be rented for cash or by pre-paid card — the very payment practice that the G6 Defendants had undertaken to a public prosecutor in August 2017 to restrict at a Motel 6 property in order to prevent that property from being used for commercial sexual exploitation, and the payment practice by which the rooms used for the trafficking of A.B. at the Subject Hotel were in fact paid for;

(f) controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

(g) establishing detailed policies and protocols dictating, step by step, everything that occurred from the time a guest arrived at the Subject Hotel until the guest entered a guest room, including required payment methods, identification requirements, the

number of guests permitted in each room and whether information was to be collected for each guest, and what questions hotel staff were and were not to ask;

(h) collecting, retaining, monitoring, and analyzing detailed data about every guest;

(i) exercising and retaining the right to exercise control over virtually all aspects of room reservations and payment;

(j) establishing and maintaining a brand-wide "do not rent" system, setting all policies governing the use of that system, and dictating the day-to-day details of reservations at the Subject Hotel through those policies, and maintaining a national registry of guests who have exhibited problematic behavior against which, upon information and belief and as the G6 Defendants have themselves represented to a Texas court, the identification of every registered guest was required to be cross-referenced at check-in; and

(k) listing the Subject Hotel in the Global Distribution System and in other online travel agency databases, maintaining brand-wide toll-free reservation telephone numbers through which rooms at the Subject Hotel were booked, and supplying and controlling the revenue management tools used at the Subject Hotel.

**IX. G6 Defendants are jointly responsible for the trafficking of A.B.**

122. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

123. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise

and/or as alter-egos. Upon information and belief, the G6 Defendants and Franchisee Defendant were likewise participants in a joint venture with one another in the operation of the Subject Hotel, which involved a common enterprise, the sharing of the revenue and profits generated by the Subject Hotel, a community of interests, and joint rights of control and management over its operation, and each is therefore vicariously liable for the violations of the other.

**X. Causation.**

124. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to A.B.

125. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to A.B. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA**

126. A.B. incorporates all other allegations.

**COUNT I. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

127. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

128. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

129. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

130. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel, including the reservation,

guest-registration, national do-not-rent, and payment systems through which the very rooms used to traffic A.B. were booked and paid for.

131. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee, including the members of the staff of the Subject Hotel. Because Franchisee Defendant and the staff of the Subject Hotel acted as the agents of the G6 Defendants, their knowledge of, and participation in, the venture through which A.B. was trafficked is imputed to the G6 Defendants, who are therefore liable as beneficiaries under 18 U.S.C. § 1595(a) irrespective of whether they directly participated in that venture.

**COUNT II. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)**

132. A.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is entitled to bring a civil action against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

133. A.B. had not attained the age of eighteen years at any time during the period she was trafficked at the Subject Hotel. Her traffickers therefore violated 18 U.S.C. § 1591(a) without regard to any showing of force, threats of force, fraud, or coercion.

134. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including A.B.'s traffickers, even though Defendants knew or should have known that these traffickers were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

135. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee Defendant regarding

the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

136. Defendants' participation in these ventures combined with the traffickers' conduct, and the other unlawful acts and omissions alleged in this Complaint, to cause A.B. to suffer substantial physical and psychological injuries and other damages because of being trafficked at the Subject Hotel as a child.

**DAMAGES**

137. As a direct and proximate result of Defendants' conduct, A.B. has suffered and will continue to suffer substantial damages.

138. Defendants' involvement and failure to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate cause of the injuries and damages sustained by A.B. in this case including, but not limited to, being the victim of the commercial sexual exploitation of a child when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being caused, as a girl of fourteen and then fifteen years of age, to engage in commercial sex with numerous adult sex buyers, as well as all residual injuries suffered by PTSD.

139. A.B. being sex trafficked at the Subject Hotel as a child was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to depression, anxiety disorders, and PTSD, which in turn affects daily functioning.

140. As a consequence of being sex trafficked at the Subject Hotel, A.B. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Lost earnings and loss of earning capacity, past and future;

(g) Necessary past and future medical expenses;

(h) Life care expenses;

(i) Physical impairment;

(j) Disgorgement of profits obtained through unjust enrichment;

(k) Restitution;

(l) All damages allowable under the TVPRA;

(m) Attorneys' fees as allowed by law;

(n) Punitive damages with respect to each cause of action;

(o) Costs of this action;

(p) Prejudgment and all other interest recoverable; and

(q) Such other and further relief to which A.B. may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: August 13, 2026

Respectfully submitted,

/s/ Jason Byrd
Jason Byrd
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph D. Janis, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS & LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com

Attorneys for Plaintiff